### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIBERTY STATE BENEFITS OF | ) | |
| DELAWARE, INC., *et al.*, | ) | Case No. 11-12404(KG) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| RICHARD W. BARRY, As Chapter 11 | ) | |
| Trustee For the estates of LIBERTY | ) | |
| STATE BENEFITS OF DELAWARE, | ) | Adv. Pro. No. 14-50020(KG) |
| INC., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SANTANDER BANK, N.A. formerly | ) | |
| Known as Sovereign Bank, N.A., | ) | |
| | ) | |
| Defendant. | ) | **Re: Dkt. No. 24** |
| | ) | |

### MEMORANDUM OPINION[1]

On January 10, 2014, Richard W. Barry, Chapter 11 Trustee (the "Trustee" or the "Plaintiff") for the estate of Liberty State Benefits of Delaware, Inc. ("LSBDE"), Liberty State Benefits of Pennsylvania, Inc. ("LSBPA"), Liberty State Financial Holdings Corp. ("LSFH"), and Liberty State Credit, Inc. ("LSCI") (collectively, the "Debtors") commenced this adversary proceeding against Santander Bank, N.A. ("Santander" or the "Defendant") alleging numerous violations of both New Jersey law and U.S. federal law.

---

[1] On June 2, 2014, this Court entered into an order declaring the Trustee's claims to be non-core under 28 U.S.C. § 157(b)(1). Order Determining Core and Non-Core Claims, D.I. 62. Thereafter, the District Court denied Santander's Motion to Withdraw the Reference. Memorandum Order Denying Motion For Withdrawal Of Reference, D.I. 65. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

More specifically, the Trustee's complaint alleges that Santander aided and abetted various Debtor affiliates in effectuating a series of transactions designed to steal the Debtors' assets.  In response to the Complaint (the "Complaint"), Santander filed this motion to dismiss (the "Motion") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the following reasons, the Court concludes that the Motion should be GRANTED with respect to all claims arising from the Debtors' notes offerings and all direct liability claims arising out of the Hope Now Scheme.  The Court holds that the Motion should be DENIED with respect to all claims arising out of the Ministrelli Trust Theft and the Lacey Property Theft and DENIED with respect to all vicarious liability claims arising out of the Hope Now Scheme.

## I. FACTS

On July 29, 2011 (the "Petition Date"), the Debtors filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the District of Delaware (Case No. 11-12404 (KG)).  On January 10, 2014, Richard A. Barry (the "Trustee"), acting as Chapter 11 Trustee for the Debtors, commenced this adversary proceeding (the "Adversary Proceeding") against Santander.  In the Complaint, the Trustee asserts eleven causes of action stemming from a series of transactions allegedly designed by the participants (the "Non-Party Conspirators" or the "Conspirators") to convey various assets of the Debtors to various non-Debtor affiliates for minimal to no value.  Compl. ¶¶ 170-261.  According to the Complaint, Santander and its employees were instrumental in enabling the Non-Party Conspirators to complete the theft.  *Id.*  The four transactions that gave rise to the Complaint follow.

2

## A.  The Ministrelli Trust Theft

The Ministrelli Trust (the "Trust") was the Debtors most valuable asset prior to the Petition Date.  Compl. ¶ 6.  The Trust held a life insurance policy of a wealthy individual with a face value of $11.5 million.  *Id*.  The Debtors acquired the beneficial interest in the Trust in December 2008.  Compl. ¶ 57.  Through a series of transactions involving the creation of numerous bank accounts designed solely to facilitate the transfer of the Trust proceeds, Santander allegedly aided and abetted the Non-Party Conspirators in "conspir[ing] to steal the Ministrelli Trust, sell[ing] the policy to a third party, and launder[ing] the sales proceeds through their personal Santander accounts to avoid detection before ultimately depositing the funds in an account owned by [certain Non-Party Conspirator affiliates]."  Compl. ¶ 58.

Santander and the Non-Party Conspirators allegedly effectuated the theft through a serious of carefully planned stages.  The first stage involved removing Michael Kwasnik ("MKwasnik"), the Debtors' counsel and founder, as trustee of the Ministrelli Trust.  Compl. ¶ 59.  The Plaintiff notes that this step was crucial because "[MKwasnik] was already in the crosshairs of a lawsuit commenced by the Debtors' lender holding a secured interest in the Ministrelli Trust."  *Id.*  Shortly before the Non-Party Conspirators removed MKwasnik as trustee, Westdale Construction, Ltd. ("Westdale"), a lender with a security interest in the Trust, sent a letter to MKwasnik informing him of its rights in the collateral.  *Id.*  Because MKwasnik was aware of Westdale's rights in the Trust, the Complaint alleges that it was essential that the Conspirators remove him as trustee so that

a successor trustee could claim ignorance of the lawsuit and Westdale's security interest. *Id.*

In October 2009, the Non-Party Conspirators appointed David Chalmers ("Chalmers") as successor trustee.[2]  Compl. ¶ 61.  In order to formalize Chalmers' appointment, the Conspirators "prepared a document entitled 'Appointment of Successor Trustee' by which MKwasnik purportedly resigned as trustee of the Ministrelli Trust and appointed Chalmers in his stead as successor trustee."  Compl. ¶ 62.  The document was signed by Chalmers and MKwasnik and was notarized by Robert F. Goodsen in November 2009.  *Id.*

The Trustee further alleges that during this time, the Non-Party Conspirators created two additional copies of the Appointment of Successor Trustee document. Compl. ¶ 63.  In order to "create the false appearance" that MKwasnik had received notice of the Westdale lawsuit *after* his resignation as trustee, these duplicates were backdated to June 2009.[3]  *Id.*

In November 2009, Chalmers took the backdated documents to Santander's Westmont, New Jersey Branch (the "Westmont Branch").  Compl. ¶ 64.  The Complaint alleges that one of Santander's employees, Kimberly Hicks-Finnerty[4] ("Hicks-Finnerty"), proceeded to fraudulently notarize the Appointment of Successor Trustee agreement.  *Id.*

---

[2] The Trustee notes that Chalmers was ineligible to serve as trustee as the trust agreement required all successor trustees to be licensed attorneys or institutional trustees.  Compl. ¶ 61.  Chalmers was neither.  *Id.*

[3] Apparently, the Non-Party Conspirators believed that this would relieve MKwasnik of his obligation to inform the successor trustee of Westdale's interest in the Trust.

[4] Hicks-Finnerty was the operations manager of the Wesmont Branch and was promoted to branch manager sometime in 2010.

In doing so, she "certif[ied] 'under penalties of perjury' that on ***June 20, 2009***, each of MKwasnik and Chalmers had 'personally appeared' before her, provided satisfactory evidence of his identification, and acknowledge his signature." *Id*. (emphasis added). MKwasnik later testified that he had never signed the backdated version of the Appointment of Successor Trustee Agreement, never met Hicks-Finnerty in person, and that "the signature [on the document] notarized by Hicks-Finnerty [was not] his." Compl. ¶ 65.   Around that same time, Chalmers brought a copy of the backdated document to Edward Green[5] ("Green"), another Westmont Branch employee, who notarized the document and swore under the penalty of perjury that MKwasnik had appeared before him that day.  Compl. ¶ 66.  However, expert handwriting analysis later confirmed that the signature on the document was not MKwasnik's.  Compl. ¶ 67. Additionally, MKwasnik's cell phone log showed that he was not physically present in Westmont that day.  *Id.*  According to the Complaint, "had Santander and its notaries refused to notarize the fraudulent, backdated appointments, and had they insisted that MKwasnik appear personally and sign the Appointments as of the actual date of his signature, the Ministrelli Conspirators' plot would have been foiled."  Compl. ¶ 69.  The Trustee asserts that had Santander refused to backdate the Appointment of Successor Trustee agreement, MKwasnik would have immediately exposed himself to criminal and civil sanctions for transferring legal title to the Trust while having knowledge of Westdale's security interest.  *Id*.

---

[5] The Complaint notes that aside from Hicks-Finnerty, Green was the only other employee at the Westmont Branch authorized to provide notarial services to customers.  Compl. ¶ 33.

After legal title to the Trust was passed to Chalmers, the Conspirators next "opened up several new accounts at Santander to enable them to receive and launder the proceeds from their fraudulent sale of the Ministrelli Trust." Compl. ¶ 70. On September 24, 2008, Non-Party Conspirator Meghan Faiola ("MFaiola"), assisted by Green, opened a new account in the name of "Dillenschneider & Faiola LLC" (the "D&F Account"). Compl. ¶ 71. On November 2, 2009, Chalmers directed Green to open an account "in the name of LSBPA's Ministrelli Trust (the "Ministrelli Account"), purportedly for the benefit of LSBPA."[6] Compl. ¶ 72. Chalmers was granted full signatory authority over this account. *Id*. According to the Complaint, Santander's internal policies required it to "review the terms of any trust for which it opened a trust account." *Id*. Had Santander done its required due diligence, it would have discovered that Chalmers was not qualified to serve as trustee under the terms of the formal trust agreement.[7] *Id*. With respect to the D&F Account and the Ministrelli Account, Green "misrepresented on the signature card that the [accounts were] opened with a $50.00 deposit. *Id.* Santander's records verify that this representation was patently false. *Id.*

---

[6] While the Trustee alleges that Green was asked to "open an account in the name of . . . LSBPA's Ministrelli Trust, purportedly for the benefit of LSBPA," the Defendant claims that Santander had no knowledge of LSBPA's interest in the account and denies the existence of a traditional banker-customer relationship between Santander and the Debtors. Compl. ¶ 72; Def.'s Br. 37-38. In support of this claim, Santander attached the "Ministrelli Trust Account Opening Card" which interestingly contains no mention of the Debtors. West Aff., Ex. F, D.I. 24. However, the account opening card does reference a formal separate trust agreement, dated September 14, 2007. Additionally, it states that Chalmers owned the account as trustee, thus putting Santander on constructive notice that some other entity held a beneficial interest in the account. These facts are particularly relevant to the section on the Trustee's negligence claim *infra* and will be incorporated by reference therein.

[7] Santander's own exhibit demonstrates that it was, at minimum, on constructive notice that this document existed. West Aff., Ex. F, D.I. 24.

Sometime after this date, the Ministrelli Account was closed. Compl. ¶ 74. In January 2010, Hicks-Finnerty allegedly "re-opened" the Ministrelli Account and "misrepresented on the account's new signature card that the required account-opening deposit had been made." *Id*. During this time, a third account was opened at the Westmont Branch. Compl. ¶ 76. According to the Trustee, Green opened an account for MFaiola in the name of MFaiola (the "MFaiola Account") solely for the purpose of laundering the sale proceeds from the Ministrelli Account to the D&F Account. *Id*. Hicks-Finnerty and Green were "given bonus credit for opening the MFaiola Account" as Santander incentivized its employees to open new accounts for its then-existing customers. Compl. ¶ 77.

The actual theft of the Trust began in late 2009 when the Leo Group LLC ("Leo"), an Indiana limited liability company, offered to purchase the Trust's insurance policy for $1.75 million. Compl. ¶ 78. According to the Trustee, the Non-Party Conspirators accepted this offer without obtaining the Debtors' authorization. *Id*. In order to permit the transfer to proceed without such authorization, the Conspirators created a "fraudulent Trust Beneficial Interest Purchase and Sale Agreement, dated as of December 29, 2009, purportedly between Leo, as purchaser, and LSBPA, as seller (the "Sale Agreement")". Compl. ¶ 80. The Sale Agreement was "purported to be signed on behalf of LSBPA by William Kwasnik ("WKwasnik"), LSBPA's CEO, and on behalf of the Minstrelli Trust by Chalmers, as Trustee." Compl. ¶ 82. However, evidence later confirmed that WKwasnik never actually signed the Sale Agreement and that his signature had been forged. *Id.* Nonetheless, Hicks-Finnerty notarized this document attesting that

WKwasnik had personally appeared before her and had presented proper identification. *Id*. at ¶ 83. However, Santander surveillance footage later showed that WKwasnik never stepped foot in the Westmont Branch that day. Compl. ¶ 84.

On or about July 8, 2010, a $300,000 installment payment on the purchase price was deposited in the Ministrelli Account.[8] Compl. ¶ 86. According to the Complaint, Santander's internal fraud alert system "immediately flagged the wire transfer as suspicious, likely because of its large round number; the Ministrelli Account's zero balance; and absence of any prior transactions." Compl. ¶ 87. Nonetheless, Santander ignored this alert. *Id*. To make matters worse, the Trustee claims that Green and Hicks-Finnerty were aware that the wire was about to be made as Anthony Faiola ("AFaiola"), husband of MFaiola, informed Green that the transfer was underway. Compl. ¶ 88. Immediately after the transfer went through, Chalmers began to divert the $300,000 installment payment. Compl. ¶ 89. He wrote a $289,000 check to MFaiola and a $10,000 check to the D&F Account. *Id*. He next withdrew $900 for himself, leaving approximately $100 remaining in the account. *Id*. As the Debtors had a legal right to the proceeds from the sale of the Trust, the Complaint alleges that Chalmers breached his fiduciary duties by making these payments. *Id*.

After Chalmers finished disbursing the first installment, MFaiola took the $289,000 she had received from him and deposited the money in her personal account at the Westmont Branch. Compl. ¶ 90. She simultaneously "made out a check in exactly

---

[8] According to the Complaint, Leo proceeded immediately to sell its interest in the Trust for $1,981,625, a $230,000 premium over the value received by the Debtors. Compl. ¶ 85.

the same amount . . . and deposited the check into the D&F Account." *Id.* These transfers were immediately flagged by Santander's fraud alert system but were never investigated by the bank. Compl. ¶ 90-94.

According to the Complaint, after the $300,000 installment was stolen from the Ministrelli Account, the Conspirators "contrived to have the remainder of the purchase price paid directly to them, rather than to the Ministrelli Account." Compl. ¶ 95. In order to accomplish this, they needed to take a few extra steps to circumvent certain developments in the Westdale lawsuit. The first of these developments occurred on February 18, 2010, when Westdale obtained a court order providing for the "attachment of the Debtors' assets, and scheduling a further hearing on March 1, 2010, to decide whether to appoint a new trustee for the Minstrelli Trust." Compl. ¶ 96. However, the court was unaware that the Non-Party Conspirators had fraudulently appointed Chalmers as the new trustee. *Id.* On March 5, the court issued another order removing MKwasnik as trustee and appointing William J. Hughes, Jr. ("Hughes") as successor trustee. Compl. ¶ 97.

Notwithstanding the court order appointing Hughes as trustee, Chalmers decided to inform Leo in writing that he had assigned the remaining payments to D&F and "requested that Leo/Tranen wire the main purchase price directly into the D&F Account at Santander." Compl. ¶ 98. Leo agreed but insisted on a formal notice of assignment. Compl. ¶ 99. However, because Chalmers sent the letter to Leo after the March 5 court order appointing a new trustee, the Conspirators had to backdate this document (the "Backdated Notice of Assignment") to February 10th in order to create some legitimacy

to Chalmers' assignment.  Compl. ¶¶ 100-01.  The Non-Party Conspirators prepared two identical versions of the document – one was notarized by Hicks-Finnerty, and the other was notarized by Green.  *Id.*  The remainder of the purchase price was then wired directly to the D&F Account, and the theft was effectively completed.  Compl. ¶ 102.

According to the Complaint, the final installment payment of about $1,450,000 should have triggered Santander's fraud alert system because the wire transfer was "nearly 7,000 times larger than the D&F Account's balance for that month," "[t]he entire amount of the transfer was quickly withdrawn from the D&F Account," the deposit was "inconsistent with the normal financial activity of an insurance business," and the transactions "involved transfers between related accounts and/or account-holders."  Compl. ¶ 104.  Nevertheless, Santander's system failed to react to these red flags.  *Id.*

Shortly after the Conspirators had completed the theft, WKwasnik stormed into the Westmont Branch and accused Santander of "having facilitated the Ministrelli Conspirators' theft of the Ministrelli Trust."  Compl. ¶ 106.  Accusing Hicks-Finnerty of aiding the conspiracy, WKwasnik claimed that he had never authorized the sale of the Trust and that his signature on the Sale Agreement had been forged.  Compl. ¶ 107.  By this time, Hicks-Finnerty had been promoted to Branch Manager of the Westmont Branch.  Compl. ¶ 108.  After her encounter with WKwasnik, Hicks-Finnerty reported the incident to her regional operations manager.  *Id.*  According to the Trustee, the matter "quickly reached the highest levels of management at Santander."  *Id.*

Upon receiving notification of the events that transpired at the Westmont Branch, Santander allegedly took numerous steps to remove all evidence of wrongdoing.

10

*See id*. at ¶¶ 109-114.  For example, Santander's notaries were required to keep logbooks detailing the "date of notarization, the signatory's name, the title of the notarized document, the signatory's address, and the signatory's driver's license number and date of expiration."  Compl. ¶ 109.  In her testimony to this Court, Hicks-Finnerty asserted that she scrupulously followed this policy in performing the duties of her job.  *Id*.  However, when asked to produce the logbooks documenting the Sale Agreement, Appointment of Successor Trustee agreement, and the Backdated Notice of Assignment, both Hicks-Finnerty and Green claimed that these notebooks had been lost.  Compl. ¶ 112.  Although the Trustee produces no direct evidence that Hicks-Finnerty, Green or Santander destroyed the notebooks, he alleges that the circumstantial evidence detailed above casts serious doubt on Santander's claim that the logbooks' disappearance was merely a coincidence.  Compl. ¶ 112.  Accordingly, he alleges that their disappearance was merely a part of a massive Santander cover up designed to purge all evidence pertaining to the Ministrelli Trust Theft.  The Trustee further notes that in late 2012 or early 2013, "Santander migrated to a new email archive system" and all e-mails relevant to this proceeding were lost.  Compl. ¶ 114.

## B.  "Hope Now" Fraud

According to the Trustee, the Hope Now Mortgage Fraud (the "Hope Now Fraud" or the "Hope Now Scheme") was a scheme designed by various individuals and entities including MKwasnik, Santander, and the law firm Kwasnik, Rodio, Kanowitz & Buckley ("KRKB") (collectively, the "Hope Now Conspirators" or "Hope Now Modifications") to "steal funds from desperate customers seeking to renegotiate their mortgages."  Compl. ¶

13.   MKwasnik and KRKB formed Hope Now Modifications in December, 2008. Compl. ¶ 117.   Adopting a name similar to the federal government's "Hope Now Alliance Program," the Hope Now Conspirators "solicited hundreds of consumers with troubled mortgages, misrepresenting themselves as a 'powerful ally' affiliated with the federal government."   Compl. ¶ 13.   In exchange for an upfront fee, the Hope Now Conspirators promised prospective clients that they would help them to renegotiate their mortgage loans with their lenders.   *Id*.   According to the Trustee, MKwasnik allegedly co-mingled funds between the Debtors' trust accounts and the Hope Now Scheme accounts (the "Hope Now Accounts") at Santander.   Compl. ¶ 14.   MKwasnik and KRKB allegedly "stole at least $237,000.00 from the Debtors' accounts to facilitate their Hope Now Scheme and deposited those funds into their account at Santander used to launder their ill-gotten proceeds from the scheme."   *Id*.   Moreover, these transfers between the Debtors' accounts and the Hope Now Accounts constituted a significant percentage of all monies going in to the Hope Now Accounts.   *See generally* Compl. ¶ 125.

The Trustee asserts that Santander profited from the Hope Now Conspirators' actions by incurring numerous insufficient funds fees and other related fees.   Compl. ¶ 15.   As was the case with the Minsitrelli Trust Theft, the Conspirators opened multiple accounts at the Westmont Branch in order to facilitate the Hope Now Scheme. Moreover, Santander apparently ignored countless red flags indicative of fraudulent activity including "[u]p to sixteen checks returned on credit card chargebacks per day," "[d]eposits of up to forty checks in small – often identical – sums every day," and "multiple stop requests per day."   *Id*.   Additionally, the main Hope Now Account was

"overdrawn for twenty-eight consecutive days."  Compl. ¶ 126.  In light of this, one of Santander's employees repeatedly recommended that the account be shut down.  Compl. ¶ 127-28.  Nevertheless, Santander continued to pay overdrafts and reverse the charges for doing so.  Compl. ¶¶ 127-33.

During this time, Santander was aware or should have been aware that the Federal Trade Commission ("FTC") had commenced proceedings against the Hope Now Conspirators for fraud in March, 2009.  Compl. ¶¶ 135-38.  Nonetheless, employees at the Westmont Branch continued to open up new accounts for the Hope Now Conspirators while ignoring these various indicators of fraud.  *Id.*  Santander failed to close the accounts until February 21, 2010, nearly one year after the FTC proceedings pertaining to these accounts had begun.  Compl. ¶ 140.

## C.  Michael Kwasnik's Ponzi Scheme[9]

According to the Complaint, Michael Kwasnik further defrauded the Debtors by "misappropriating or misapplying at least $13 million in proceeds from the Debtors' debt offerings as part of a Ponzi scheme targeting elderly persons and disabled persons."  Compl. ¶ 10.  MKwasnik allegedly stole the proceeds from these debt offerings, saddling the Debtors with new liabilities "without the benefit of the proceeds from the notes."  *Id.*  In order to create the illusion that the debt instruments were offering high rates of interest, Kwasnik paid off earlier investors with the proceeds of the later sales.  *Id.*

---

[9] There appear to be numerous inconsistencies between the way the Trustee describes the "MKwasnik Ponzi Scheme" in the Complaint and the way he described the "MKwasnik Ponzi Scheme" in other complaints.  Santander notes that in other proceedings before this Court, the Trustee specifically alleged that the Debtors derived significant benefits from the Ponzi Scheme and knowingly participated in the notes offerings.  *See infra* "Santander's *In Pari Delicto* Defense."

The Trustee notes that MKwasnik and his confederates routinely laundered the proceeds of the offerings through various Santander accounts they had set up at the Westmont Branch.  Compl. ¶ 11.  One particular account, the "Kopacz Trust Account," was created for one of MKwasnik and KRKB's clients.  Compl. ¶ 145-47.  MKwasnik allegedly told Kopacz and other clients that he set up the accounts to facilitate note interest payments when in reality "the purpose of such accounts was to facilitate MKwasnik's money laundering among Santander's accounts."  *Id.*  Between February 2008 and July 2009, MKwasnik embezzled nearly $200,000 from this one account alone, transferring the money to himself and/or KRKB.  Compl. ¶ 149-50.  Additionally, some of these transfers never even appeared on the Kopacz Trust Account's monthly statements.  Compl. ¶ 153.

As was the case in the Hope Now Conspiracy, Santander ignored multiple indicia of fraud.  Compl. ¶ 11.  In addition to overlooking the red flags detailed above, Santander also failed to investigate many high volume accounts with minimal balances, "deposits followed by immediate withdrawals," "multiple transfers between related accounts," and "transactions inconsistent with the account holders' businesses, occupations, or income levels."  *Id.*  In June 2013, MKwasnik pled guilty to second and third-degree money laundering in connection with these schemes.  Compl. ¶ 12.

### D.  Theft of the Lacey Property

Santander allegedly assisted the Non-Party Conspirators in the theft of real property owned by LSBPA in Lacey, NJ (the "Lacey Property").  Compl. ¶ 16.  The Trustee claims that the Non-Party Conspirators colluded to transfer the Lacey Property

14

away from the Debtors and reap the profits for themselves in February 2010.  *Id.*  He alleges that Santander facilitated the sale when Hicks-Finnerty and Green fraudulently notarized the deed and other documents necessary to complete the transfer.  *Id.*  More specifically, WKwasnik transferred the Lacey Property to MFaiola (one of the Non-Party Conspirators in the Ministrelli Trust Theft) for "grossly inadequate consideration (on information and belief, no consideration)."  Compl. ¶ 159.  MFaiola then sold the property to Hector Rivera, AFaiola's friend, for $175,000.  Compl. ¶ 160.

### E.  Santander's History of Unlawful Banking Conduct

On April 13, 2011, the Office of the Comptroller of the Currency ("OCC") "identified certain deficiencies and unsafe or unsound practices in [Santander's] residential mortgage servicing and in the Association's initiation and handling of foreclosure proceedings." Consent Order, *In the Matter of Sovereign Bank, Wyomissing, Pennsylvania*, OTS Docket No. 04410, Order No.: Ne-11-17 (eff. Apr. 13, 2011) (the "2011 Consent Order"), at 1.  After the consent order was issued, Santander was one of ten banks that entered into a settlement agreement with federal regulators.  Compl. ¶ 168.

### F.  The Trustee's Complaint and the Defendant's Motion to Dismiss

The Trustee asserts eleven causes of action against Santander and seeks to recover damages that the Debtors incurred as a result of the above transactions.  His claims include: (a) racketeering under NJ RICO, (b) conspiracy to violate RICO, 18 U.S.C. § 1962(d), (c) violation of New Jersey's Consumer Fraud Act, (d) negligence, (e) aiding and abetting conversion, (f) aiding and abetting fraud, (g) two causes of action for aiding and abetting breach of fiduciary duty, (h) unjust enrichment, (i) failure to train and

15

supervise employees, and (j) attorneys' fees pursuant to NJ RICO and NJ Consumer Fraud Act.

## II. DISCUSSION

### A. Standard of Review

In order to survive a motion to dismiss, a plaintiff must go beyond "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain sufficient facts "to state a claim to relief that is plausible on its face." *Id*. at 570. Also, courts must accept all well-pleaded factual allegations as true but are not required to accept as true legal conclusions or conclusory statements. *Ashcroft v. Iqbal*, 556 U.S. 662, 664-65 (2009); *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

Rule 8(a) of the Federal Rules of Civil Procedure (the "Rules") requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). Under this standard, substantive sufficiency and sufficient notice are all that are required under the Rules. *Id*. However, when a plaintiff's allegations involve claims of fraud, he must meet the heightened pleading threshold set forth in Rule 9(b). FED. R. CIV. P. 9(b). A fraud complaint must "plead with particularity the circumstances of the alleged fraud" by describing the "precise misconduct with which [the defendant] is charged." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004). Federal courts of appeals have concluded that the Rule 9(b) pleading requirements apply to all civil RICO claims that involve allegations of fraud. *See id*; *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-1401 (9th

Cir. 1986); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 19 (2d Cir. 1983), cert. denied, 465 U.S. 1025 (1984). Nonetheless, some courts have relaxed this standard for bankruptcy trustees bringing claims of fraud on behalf of the debtor and its creditors. *See Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747, 753 (Bankr. D. Del. 2007) (citing *Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.)*, 327 B.R. 711, 717 (Bankr. D. Del. 2005)). The policy justification for reducing the burden is that as a third party outsider, a trustee must "rely on secondhand knowledge for the benefit of the estate and all of its creditors." *Global Link Liquidating Trust*, 327 B.R. at 717 (quoting *In re O.P.M. Leasing Services, Inc.*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983)). Moreover, as the purpose of the heightened pleading standard is to protect a defendant from the burdens of discovery associated with a fraud claim, courts have relaxed this standard in cases where discovery had already been completed. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011). Because the Trustee has already conducted some discovery relating to the four transactions, the Court finds this policy concern to be particularly relevant.

In light of these policy concerns, the Court will apply a slightly relaxed version of the Rule 9(b) standard for the Trustee's RICO claims involving fraud. All other claims will be analyzed under the ordinary *Twombley* and *Iqbal* framework.

## B. Santander's *In Pari Delicto* Defense

Before examining the merits of the Trustee's substantive claims, the Court will address a significant threshold issue. Santander alleges that because the Debtors were

responsible for effectuating the transactions discussed above, the Trustee's claims should be dismissed on the ground of *in pari delicto*.

Before addressing the *in pari delicto defense*, however, it is first necessary for the Court to determine whether it should permit consideration of certain evidence indicating that the Debtors were at fault.  In support of its *in pari delicto* defense, Santander proffers supplemental facts which indicate that the Debtors' were primarily responsible for carrying out these transactions and were therefore at fault for causing their own loss. Def.'s Br. 3-7.  Ordinarily, a court addressing a motion to dismiss only examines the allegations contained in the complaint itself and accepts these facts as true.  However, a court may take judicial notice of facts not alleged in the complaint in certain circumstances.  *See, e.g*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  The Federal Rules of Evidence provide that a court may take judicial notice of certain facts "not subject to a reasonable dispute" when they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  Courts may do so unilaterally or upon the request of a party.  FED. R. EVID. 201(c).

Santander requests that the Court take judicial notice of certain facts alleged by the Trustee in prior adversary proceedings, namely, the prior sworn testimony of the Trustee, and certain findings of fact made by the New Jersey Bureau of Securities in its investigation of the Debtors.  The Court determines that these facts clearly satisfy the requirements of Rule 201 as these documents were all previously submitted to this Court

18

under the penalty of perjury.    Therefore, the Court will consider Santander's supplemental facts.

The most significant disparity between Santander's supplemental facts and the Complaint pertains to the "MKwaznik Ponzi Scheme."  Def.'s Br. 4.  According to the Trustee's sworn testimony and other adversary complaints filed on behalf of the Debtors, the Debtors were actively involved in multiple offerings of unregistered securities and derived a substantial benefit from the fraudulently obtained proceeds.[10]  "The scheme of fraud and deceit appears to have been conceived and orchestrated by defendant M-Kwasnik, but was executed over a period of years . . . with the knowing and active assistance and participation of defendants W-Kwasnik and others."  *Barry v. Alternative Financial Solutions, LLC et al.*, Adv. Pro. No. 12-50378 (KG), Compl. ¶ 47.  Indeed, the New Jersey Bureau of Securities' decision to bring civil charges against the Debtors for both securities fraud and the sale of unregistered securities is what led to the chapter 11 petition in the first place.  Def.'s Br. 5.

With these additional facts established, the Court can now address the merits of Santander's *in pari delicto* defense.  The *in pari delicto* defense bars recovery by a plaintiff when that plaintiff "bears fault for the claim."  *Official Comm. of Unsecured*

---

[10] More specifically, back when he was the independent fiscal agent of the Debtors, the Trustee submitted an initial report to this Court and the Superior Court of New Jersey in the related proceedings commenced against the Debtors by the New Jersey Bureau of Securities.  Initial Report of Fiscal Agent Richard Barry, dated July 1, 2011, ¶ 12 ("Barry Report") attached as Exhibit D to Declaration of Richard W. Barry in Support of Emergency Motion, dated August 11, 2011, ("Barry Decl.") (D.I. 29-6).  Mr. Barry detailed numerous instances of misconduct by the Debtors stemming from their debt offerings and, in particular, the numerous material misstatements in the private placement memorandum (PPM) that allegedly misled investors into purchasing the Debtors' notes.  *Id.* at ¶ 22-24.  Moreover, contrary to the implications in the Complaint's discussion on the "MKwasnik Ponzi Scheme," the Debtors used $7 million of the $13 million in proceeds to pay down the interest and principal on their other obligations.  *Id.* at ¶ 29.

*Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001).  As the bankruptcy trustee steps in the shoes of the debtor, it is subject to the same defenses that could have been asserted against the debtor, including *in pari delicto*.  *Id.* at 356-58.

In response to Santander's motion to dismiss on *in pari delicto* grounds, the Trustee asserts two counter-defenses.  Tr.'s Br. 17.  First, he claims that a trustee is "cleansed" of any wrongdoing committed by a debtor's prior management.  *Id.*  Federal courts of appeals, however, have repeatedly rejected this argument, pointing out that Section 541 of the Code mandates that "to the extent [that the trustee] must rely on 11 U.S.C. § 541 for his standing in [a] case, he may not use his status as trustee to insulate the [debtor] from . . . wrongdoing."  *Lafferty*, 267 F.3d at 358 (quoting *In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1281, 1285-86 (10th Cir. 1996)).  The cases cited by the Trustee in support of his proposition that a trustee in bankruptcy is "cleansed" from a debtors' pre-petition misconduct all involved receiverships in cases arising outside of title 11.  Therefore, the Court rejects the Trustee's argument that bankruptcy trustees are "cleansed" of debtors' prior misconduct and not subject to the *in pari delicto* defense.

The Trustee's second counter defense is the "adverse interest exception."  The adverse interest exception is a narrow exception which bars the use of the *in pari delicto* defense in cases of "outright fraud or looting or embezzlement . . .  where the fraud is committed against a corporation rather than on its behalf."  *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 64 (2d Cir. 2013) (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 938 N.E.2d 941, 952, 912 N.Y.S.2d 512 (N.Y. 2010)).  If a corporation receives any sort of benefit from the fraud, no matter

how small that benefit might be, the trustee may not assert this counter-defense. *O'Connell v. Pension Fin. Servs. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 33-34 (Bankr. S.D.N.Y. 2013).

In light of the legal standards and supplemental facts discussed above, the Court finds that all claims arising from the "MKwasnik Ponzi Scheme" should be dismissed on *in pari delicto* grounds for the following reasons. First, the record indicates that the Debtors did in fact play a substantial role in the fraudulent notes offering. The Initial Report of Fiscal Agent Richard Barry, the complaint filed by the New Jersey Bureau of Securities, and the Trustee's previous complaint filed against Alternative Financial Solutions all show that the Debtors' were not "victimized" by a third party outsider. Rather, the Debtors and their affiliates engaged in a carefully orchestrated notes offering designed to fraudulently obtain capital from elderly and disabled investors. Moreover, there is also substantial evidence to suggest that MKwasnik was not merely an outsider as the Trustee claims. According to the Trustee's various other complaints, MKwasnik was the Debtors' founder, long term counsel to its board, and a corporate "insider" and person in control of the Debtors under Section 101(31)(B)(iii) of the Code. *Barry v. Kwasnik, et al.*, Adv. Pro. No. 11-53420 (KG), Compl. ¶ 11. Even if the Court were to conclude that MKwasnik was not a corporate insider for purposes of *in pari delicto*, there is simply no reasonable basis to conclude the Debtors other executives had no involvement whatsoever in the fraudulent notes offering when the record and the private placement memorandum so strongly suggest otherwise. Additionally, the adverse interest exception is patently inapplicable to the "MKwasnik Ponzi Scheme." The judicially noticed facts

21

pertaining to the Debtors notes offerings show that the Debtors did in fact derive a substantial benefit from the Ponzi Scheme, namely, $7 million in fraudulently obtained proceeds that were used to pay down other corporate liabilities.  This benefit bars the use of the adverse interest counter-defense.  In conclusion, the Debtors' level of culpability in committing fraud against unsuspecting investors mandates dismissal of all claims pertaining to the "MKwaznik Ponzi Scheme" on *in pari delicto* grounds.

With respect to the other three transactions, the Court concludes that the Trustee's claims are immune from the *in pari delicto* defense under the adverse interest exception. The Complaint essentially alleges that the Non-Party Conspirators stole various Debtor assets in the Ministrelli Trust Theft, the Hope Now Scheme, and the Lacey Property Theft.  Regardless of whether or not the Debtors bear fault for these three transactions, the fact that all three of them amounted to outright "looting of corporate assets" makes the adverse interest exception applicable.  Because Santander has not directed the Court to any evidence indicating that the Debtors derived any sort of benefit from these three schemes, the Court cannot reject the Trustee's counter-defense at this stage of the litigation.  As a result, the Court determines that it would be inappropriate to dismiss any claims stemming from these three transactions on *in pari delicto* grounds at this time. This finding does not preclude Santander from raising this defense at a later stage of the litigation if it produces evidence tending to show that the Debtors benefitted from the Minstrelli Trust Theft, the Hope Now Scheme, or the Lacey Theft.

Having determined that the District Court should dismiss all claims arising from the Ponzi Scheme, the Court will now address each of the Trustee's claims as they relate to the Ministrelli Trust Theft, the Hope Now Scheme, and the Lacey Property Theft.

## C. Count One: New Jersey RICO

Santander first moves to dismiss the Trustee's civil RICO Claim under N.J. Stat. Ann. § 2C:41-2(c). In order to prevail on a New Jersey RICO claim, a plaintiff must show: "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." *Ford Motor Co. v. Edgewood Props.*, 2009 U.S. Dist. LEXIS 4172, at *38-39 (D.N.J. Jan. 20, 2009) (quoting *State v. Ball*, 141 N.J. 142, 188 (1995)).

Under New Jersey law, element one may be satisfied by identifying members of a group and pleading the "kinds of interactions that become necessary when [the] group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose" and "[t]he division of labor and the separation of functions undertaken by the participants." *Ball*, 141 N.J. at 162. Element two simply requires the plaintiff to plead that the activities of the enterprise affected trade or commerce. *Id*. Element three mandates that the defendant associated itself with the enterprise in some form. *Id*. With respect to element four, New Jersey courts have held that in order to adequately plead a civil RICO claim, the defendant must have "purposefully and knowingly [participated] in the affairs of the enterprise." *Id*. at 175.

With respect to element five, "racketeering activity" is defined as the commission of one of numerous offenses arising out of the laws of any jurisdiction in the United States. N.J. Stat. Ann. § 2C:41-1(a). Among these offenses are robbery, bribery, arson, burglary and extortion. N.J. Stat. Ann. § 2C:41-1(a)(1)(a)-(cc). The statute also incorporates all activity defined as "racketeering" under Title 18 of the United States Code. N.J. Stat. Ann. § 2C:41-1(a)(2). A "pattern of racketeering" is defined as "[e]ngaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity" and "[a] showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J. Stat. Ann. § 2C:41-1(d)(1); N.J. Stat. Ann. § 2C:41-1(d)(2).

When analyzing these five elements, New Jersey's RICO statute mandates a liberal construction of its provisions. N.J. Stat. Ann. § 2C:41-6. This provision of the statute was enacted in response to the New Jersey legislature's extensive findings of fact indicating that the prevalence of organized crime in the state necessitated more effective techniques of combating racketeering activity. N.J. Stat. Ann. § 2C:41-1.1.

Santander asserts that the Trustee has failed to plead adequately the existence of an enterprise, the Defendant's "knowing and purposeful" participation in the affairs of the enterprise, and the Defendant's participation through a pattern of racketeering

activity.  Additionally, Santander argues that the Trustee has failed to plead causation, a threshold issue for determining whether or not the claimant has standing to pursue a civil RICO claim.  Because causation is an element common to numerous offenses alleged in the Complaint, the Court will address this issue prior to analyzing the merits of the Trustee's RICO claim.

### *1.  Causation*

In order to have standing to assert a civil RICO claim in New Jersey, a plaintiff must plead both actual and proximate causation.  *Interchange State Bank v. Veglia*, 668 A.2d 465, 473 (N.J. Super. Ct. App. Div. 1995).

> In civil RICO cases where a plaintiff's standing to sue is at issue, the court must examine the chain of events to determine who was directly injured by the predicate RICO acts. If a plaintiff is harmed only in an indirect way by the predicate acts, the plaintiff does not have standing to pursue a RICO claim.

*Id.* (citing *Prudential Ins. Co. of America v. U.S. Gypsum Co.*, 828 F. Supp. 287, 296 (D. N.J. 1993)).  When determining proximate cause in a RICO action, courts may consider different tests including foreseeability, independent intervening causes, and the "factual directness of the causal connection."  *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 483 (D.N.J. 1998) (quoting *Prudential Ins. Co. v. United States Gypsum Co.*, 828 F. Supp. 287, 293 (D.N.J. 1993)).  Additionally, "[p]roximate cause is interpreted narrowly in civil RICO claims."  *Id.*

In its brief, Santander claims that Hicks-Finnerty and Green's alleged false notarizations were not direct and substantial causes of the Ministrelli Trust Theft and the Lacey Property Theft.  The Court is not persuaded.  The executions of the Appointment

of Successor Trustee agreement, the Sale Agreement, and Backdated Notice of Assignment were crucial to the Ministrelli Theft's success.  In the Complaint, the Trustee adequately describes why the Non-Party Conspirators needed to notarize fraudulently these documents in order to appoint the new trustee, permit the sale to go through, and assign the remaining payments to the D&F Account.  The sale of the trust is clearly a foreseeable consequence of notarizing a document authorizing the sale of that trust.  The same reasoning applies to the Lacey Property Theft as well since the fraudulently notarized sale documents directly enabled the sale to occur.

With respect to Santander's alleged failure to monitor red flags, Santander argues that "such bald speculation about what might have happened had Santander reacted differently concerning the alleged 'red flags,' is clearly not the direct, substantial cause of the Debtors' alleged injury."  Def.'s Br. 18.  However, the issue of proximate cause is one for the finder of fact to determine at a later stage of the litigation.  *See Reyes v. Egner*, 404 N.J. Super. 433, 467 (N.J. Super. Ct. App. Div. 2009) (citing *Beadling v. William Bowman Assocs.*, 355 N.J. Super. 70, 87 (N.J. Super. Ct. App. Div. 2002) ("questions of proximate cause are left to the jury for its factual determination").  Having already determined that the Trustee successfully pled that Santander's fraudulent notarizations were a direct and substantial cause of the Ministrelli Trust Theft and the Lacy Property Theft, the Court need not address the issue of Santander's failure to monitor at this time.

With respect to the Hope Now Scheme, however, the Court agrees with Santander that the Trustee has failed to plead successfully that Santander's misconduct was a

proximate cause of the Debtors' injuries. Unlike the claims arising from the Ministrelli Trust Theft and the Lacey Theft, the Debtors were not the intended victims of the Hope Now Fraud. The only allegation regarding any injury suffered by the Debtors states that "on information and belief, MKwasnik and KRKB stole at least $237,000 of the Debtors' funds and placed them into the Hope Now Account." However, the Trustee fails to allege any specific facts giving rise to an inference that Santander proximately caused this $237,000 loss. Nowhere in the Complaint does the Trustee claim that Santander assisted in stealing money from the Debtors' attorney-client trust accounts. Moreover, the Trustee does not allege that MKwasnik opened the Debtors' trust account at Santander. Under any of the proximate causes tests discussed above, there is simply no way that Santander can be held responsible for the $237,000 taken from the Debtors' trust account under the custody of a different financial institution. Finding that the Trustee has failed to plead any facts demonstrating that Santander's actions were a proximate cause of the Debtors' $237,000 loss, the Court hereby concludes that the District Court should dismiss without prejudice all RICO claims arising from the Hope Now Scheme.

### 2. *Element 1: The Existence of an Enterprise*

Having dismissed all claims arising from the Ponzi Scheme and all direct claims arising from the Hope Now Scheme, the Court will now address the elements of the Trustee's RICO claim with respect to the two remaining transactions, the Ministrelli Trust Theft and the Lacey Property Theft.

The first substantive element of a New Jersey civil RICO claim is the existence of an enterprise.  In *Ball*, the New Jersey Supreme Court held that in order to determine whether or not an enterprise exists, the association must have an "organization."  *Ball*, 141 N.J. at 162.  The court defined an "organization" as follows.

> ***The organization of an enterprise need not feature an ascertainable structure or a structure with a particular configuration***. The hallmark of an enterprise's organization consists rather in those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose. The division of labor and the separation of functions undertaken by the participants serve as the distinguishing marks of the "enterprise" because when a group does so divide and assemble its labors in order to accomplish its criminal purposes, it must necessarily engage in a high degree of planning, cooperation and coordination, and thus, in effect, constitute itself as an "organization."

*Id*. (emphasis added).  The court's decision not to require an ascertainable structure is significant because it departed from the more stringent standard used by many other state and federal courts.  *Id*.

At the pleading stage of litigation, a plaintiff must come forth with specific facts demonstrating the existence of an organization.  *See id.*  Courts have held that claimants must plead some of the elements discussed in *Ball* with a certain degree of particularity.  *See Refco Inc. Sec. Litig. v. Aaron*, 826 F. Supp. 2d 478, 527 (S.D.N.Y. 2010) ("The Amended Complaint does, as discussed above, allege that [defendant] helped to prepare these statements, but it says nothing about division of labor, who agreed to do what, or whether they coordinated their activity between themselves or with other members of the enterprise").  In *Ball*, the New Jersey Supreme Court articulated that courts must focus on

the individuals, how they associated with one another, how decisions were made, and the distinct role of each individual.  141 N.J. at 162-63.

Santander argues that the Complaint fails to allege "any facts supporting the formation of the enterprise and the division of labor, including any allegations as to high level coordination or cooperation by the members of the alleged 'enterprise.'"  Def.'s Br. 20.  Additionally, it encourages the Court to adopt a narrow definition of the word "enterprise" in requiring that the Trustee establish numerous factors outlined above.  *Id.*  The Court disagrees and finds Santander's position to be inconsistent with New Jersey public policy and the applicable caselaw.  In *Ball*, the court never explicitly stated that a plaintiff must plead each and every factor which demonstrates the existence of an enterprise nor did it specify how many factors were necessary in order to support such a finding.  Some New Jersey appellate courts have found the existence of an enterprise even when the plaintiff only demonstrated some of these elements.  *See, e.g.*, *Franklin Medical Associates v. Newark Public Schools*, 828 A.2d 966, 977-78 (N.J. Super. Ct. App. Div. 2003).  Moreover, New Jersey's liberal approach to RICO claims supports a broad definition of the term "enterprise."  *See* N.J. Stat. Ann. § 2C:41-6; *see also Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir. 1989) ("[i]nterpretation of this term has been liberal").  The Trustee may satisfy his burden of establishing an enterprise by detailing specific facts that describe the Non-Party Conspirators' common objectives, division of labor, and steps taken in furtherance of the common scheme.

Under this standard, the Court finds that the Trustee has met his burden.  Paragraphs 174 through 178 of the Complaint specifically detail each Non-Party

Conspirator's unique role in carrying out the Ministrelli Trust Theft and the Lacey Theft. Furthermore, the Trustee identifies the names of the many individuals and entities that carried out the Theft. Some of these individuals and entities include Michael Kwasnik, the law firm KRKB, Anthony Faiola, Meghan Faiola, D&F, and David Chalmers. The Trustee thoroughly describes the roles and responsibilities of each individual in effectuating the Ministrelli Trust Theft. For example, the Trustee alleges in the Complaint that Chalmers was appointed successor trustee for the specific purpose of being able to claim ignorance to the Westdale lawsuit; MKwasnik played a behind the scenes role in orchestrating the theft as his direct involvement would have exposed him to civil and criminal liability; MFaiola served as an intermediary for diverting the sale proceeds; and AFaiola set up the account that served as the final destination for the proceeds. Additionally, AFaiola served in a significant ministerial role and completed various tasks that were crucial to completing the Theft. These are just a small number of the allegations contained in the Complaint that support a finding of an enterprise under New Jersey's liberal standard. The Court therefore holds that the Trustee has satisfied his burden of pleading the existence of an enterprise.

### 3.   _Elements 2 and 3: Engaging in Activities that Affect Trade or Commerce_

Santander does not dispute that the Non-Party Conspirators' activities had an impact on trade and commerce. Additionally, it does not deny that it was associated with the Non-Party Conspirators. As a result, the Court holds that the Trustee has adequately pled elements 2 and 3 of its RICO claim.

#### *4.  Element 4: Scienter*

Santander claims that the Trustee has failed to plead the Defendant's level of mental culpability.  In *Ball*, the court determined that "to conduct or participate in the affairs of an enterprise means to act ***purposefully and knowingly*** in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist or help effectuate the goals of the enterprise." *Ball*, 141 N.J. at 175.  Scienter is explicitly carved out from the heightened pleading standard of Rule 9(b).  FED. R. CIV. P. 9(b) ("[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").  The Supreme Court recognized this in *Iqbal*, observing that scienter is not subject to the heightened pleading requirements of Rule 9(b).  *Iqbal*, 556 U.S. at 687.

> A rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b).

*Id*.  (quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p 291 (3d ed. 2004)).

Federal courts have held that a plaintiff may establish intent through circumstantial evidence.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute ***strong circumstantial evidence of conscious misbehavior or recklessness***." *Id.*  (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  However, in light of the Supreme Court's observations in *Iqbal*, a decision

31

which was rendered after the Second Circuit's *Lerner* opinion, this Court is persuaded by the arguments against requiring "strong circumstantial inference of conscious misbehavior" and finds that ordinary circumstantial evidence of conscious misbehavior will suffice.[11]

Santander argues that the Complaint's assertions pertaining to scienter are merely conclusory. Def.'s Br. 21. Some of the allegations Santander refers to include the claims that "Santander colluded with the Non-Party Conspirators" and "had actual knowledge of at least some of the Non-Party Conspirators fraudulent activities." *Id*. (citing Compl. ¶ 4). Santander argues that Hicks-Finnerty and Green's alleged fraudulent notarizations amount to either ordinary negligence or gross negligence, claiming that the Trustee portrays Hicks-Finnerty and Green as "innocent dupes, not knowing participants." Def.'s Br. 22.

The Court concludes that Santander's reading of the Complaint fails to take into account the "circumstantial evidence of conscious misbehavior." *Lerner*, 459 F.3d at 290-91. In the Complaint, the Trustee notes that Santander's employees fraudulently notarized three documents and that these documents were crucial to the success of the Ministrelli Trust Theft. Compl. ¶ 185(a)-(d). Moreover, the fraudulently notarized document pertaining to the Lacey Property was crucial to the success of the Lacey Theft.

---

[11] A treatise on civil RICO law noted that the Ninth Circuit held that Rule 9(b) established a lower pleading standard for scienter in securities fraud cases. *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1545 (9th Cir. 1994). This ruling was superseded when Congress enacted Private Securities Litigation Reform Act (PSLRA) which heightened the pleading requirements for all federal securities civil claims. The treatise noted that the fact that Congress explicitly chose to heighten this requirement for securities claims but not RICO claims creates a strong argument against applying the stronger standard here. 1-7 Civil RICO ¶ 7.02 Pleading.

*Id*. at ¶ 162.  In her testimony to the Court, Hicks-Finnerty stated that she always asks for proper identification before notarizing a document and always makes sure that the person signing such document is who he says he is.  In light of this, it seems unlikely that an experienced notary such as herself could be "duped" so many times with respect to the same commercial transaction.  Moreover, when Hicks-Finnerty's testimony is viewed in conjunction with the other facts in the Complaint, the Trustee creates a plausible circumstantial inference of knowing intent.  Some of these other facts include Hicks-Finnerty and Green's knowledge of the incoming installment payment, their knowledge that the Ministrelli Account was a trust account with a beneficial owner, their knowledge that Chalmers was named as trustee, their awareness of the trust agreement that explicitly prohibited the appointment of a non-attorney such as Chalmers as trustee, their repeated failure to investigate the various red flags that were triggered in connection with these accounts, and their inability to produce their notary logbooks when requested by the Trustee.  This last allegation is particularly troublesome as is Santander's contention that no reasonable fact-finder could conclude that the notebooks' disappearance was anything other than a mere coincidence.  When viewed in the aggregate, these facts create a plausible inference of scienter with respect to both the Ministrelli Trust Theft and the Lacey Property Theft as the fraudulent notarizations were crucial to both transactions.  The Court therefore rejects Santander's assertion that it did not knowingly and purposefully participate in the affairs of an enterprise.

Notwithstanding the above, Santander argues that even if Hicks-Finnerty and Green knowingly notarized fraudulent documents, the New Jersey Supreme Court has

held that a bank may not be held vicariously liable for "a notary employee's breach of duty when the bank has no role in the underlying transaction." Def. Br. 23. (citing *Commercial Union Ins. Co. v. Burt Thomas-Aitken Constr. Co.*, 49 N.J. 389 (1967)). The facts in *Commercial Union*, however, are easily distinguishable from the facts in this case. In reaching its conclusion that a bank is generally not liable for the actions of its notary-employees, the court in *Commercial Union* reasoned:

> [r]ather the point is ***that one who seeks the services of a notary public does not ordinarily rely upon the credit of some third-party employer of the notary***; he asks only for a notary, and any notary will do. So, here, plaintiff conceded before us that it was wholly unaware of the identity of the notary and ***did not know the notary was connected with a bank***. In short, plaintiff never sought the responsibility of someone other than a notary, and if the bank is held, plaintiff will have a windfall.

*Id.* at 394. Contrary to the defendant in *Commercial Union*, Santander provided a vast array of banking and financial services to the Non-Party Conspirators. Neither party disputes this. The Trustee asserts numerous allegations which would seem to indicate that Santander's banking and notary services were inextricably interrelated for purposes of carrying out the Ministrelli Trust Theft and the Lacey Theft. The Non-Party Conspirators had a long standing relationship with the bank and were fully aware that Hicks-Finnerty and Green were employees of Santander. Hicks-Finnerty and Green performed both notarization and account management services for the Non-Party Conspirators. Santander cannot escape liability on the ground that its notarization services were merely incidental to their banking services and outside the scope of the normal employer-employee relationship. In *Commercial Union*, the court further stated that "[w]e see no good reason to hold a private employer who was in no sense a party in

34

interest in the transaction when the claimant did not look to the employee and sought nothing more than an acknowledgment before *some* notary public." *Id.* at 395. The scenario here is the polar opposite. The Non-Party Conspirators were not seeking an acknowledgement before *some* notary public. Rather, they specifically intended to utilize the services of Green and Hicks-Finnerty. Accordingly, the Court holds that Trustee has satisfied the scienter element of his RICO claim with respect to the Ministrelli Trust Theft and the Lacey Theft and that Santander may be held vicariously liable for its notary-employees misconduct under New Jersey agency law. Having determined that Santander may be held liable for the intentional acts of Hicks-Finnerty and Green, there is no need for the Court to determine the mental culpability of Santander's other employees.

### 5.  *Element 5: Participation in a Pattern of Racketeering Activity*

Santander argues that the Trustee has failed to plead that it participated in a pattern of racketeering activity. The statute defines a "pattern of racketeering activity" as "*[e]ngaging in at least two incidents of racketeering conduct* one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity" and "[a] *showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents*." N.J. Stat. Ann. § 2C:41-1(d)(1)-(2) (emphasis added). Santander addresses these two elements in reverse order

and first argues that the alleged incidents were not "interrelated by distinguishing characteristics and [were] isolated incidents."  *Id.*

> a.  <u>Pattern of Racketeering Element 1: Relatedness of the Acts</u>

In its brief in opposition to the Motion, the Trustee argues that the relevant statutes and caselaw all suggest that courts should apply a liberal standard in determining "relatedness."  Tr.'s Br. 31.  The Court is persuaded by this argument for a number of reasons.  First, a plain reading of the statute shows that the test for "relatedness" is a disjunctive one.  N.J. Stat. Ann. § 2C:41-1(d)(2).  So long as a complaint tends to show that the multiple incidents of criminal conduct have similar "purposes, results, participants *or* victims *or* methods of commission," a court should find the "relatedness" sub-element satisfied.

The Court does not agree with Santander's assertions that the Ministrelli Trust Theft, Hope Now Fraud, Ponzi Scheme and Lacey Theft were "artificially stiche[d] together" by the Trustee.  Def.'s Br. 28.  While we do not know the full extent of inter-relatedness of these transactions, there are concrete allegations in the Complaint indicating some level of interconnectedness between them.  First, Michael Kwasnik was a common participant in all of these schemes.  While Santander notes that MKwasnik did not participate in the Ministrelli Trust Theft, the decision to remove himself as trustee was crucial to the Theft occurring.  Additionally, the Trustee's prior complaints, the New Jersey Bureau of Securities' complaint, and the New Jersey and Delaware indictments all seem to suggest that MKwasnik may have been the mastermind behind all of these schemes.  Those facts on their own are enough to satisfy the "relatedness" sub-element.

However, other facts in the Complaint support a holding that the individual steps taken to complete the Ministrelli Trust Theft constituted interrelated criminal acts that were committed for the same general purpose – to steal the Ministrelli Trust proceeds and the Lacey Property. Therefore, the Court holds that the "relatedness" element is satisfied under N.J. Stat. Ann. § 2C:41-1(d)(2).

### b.  Pattern of Racketeering Element 2: Predicate Acts

In order for a court to find that a defendant was engaged in a "pattern of racketeering activity," the defendant must have also engaged in at least 2 predicate acts of racketeering activity. N.J. Stat. Ann. § 2C:41-1(d)(1). "Racketeering Activity" is defined in Section 2C:41-1(a)(1) and includes a long list of criminal offenses. N.J. Stat. Ann. § 2C:41-1(a)(1). In the Complaint, the Trustee alleges ten predicate offenses. Rather than addressing each predicate offense individually, Santander puts forth omnibus objections with respect to elements common to multiple offenses. The Court will address Santander's arguments in the order in which they appear in its brief:

### c.  Predicate Act I: Bank Fraud

The first alleged predicate act is Bank Fraud under 18 U.S.C. § 1344. The statute penalizes any individual or entity who "knowingly executes, or attempts to execute, a scheme . . . to defraud a financial institution, *or* . . . ***to obtain any of the moneys, funds, credits, assets*** . . . or other property owned by, or ***under the custody or control of a financial institution***, by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344(1)-(2).

A plain reading of the statute would seem to suggest that in order to be held liable under Section 1344, a defendant must have either defrauded a financial institution *or* used fraudulent methods to obtain assets under the control of a financial institution. *Id.* In spite of this plain language, however, the Third Circuit has openly rejected this disjunctive interpretation. *United States v. Thomas*, 315 F.3d 190, 199 (3d Cir. 2002). Citing to public policy concerns, the Third Circuit articulated that the purpose of the federal bank fraud statutes is to protect financial institutions themselves. *Id.* at 196. In light of this policy consideration, the court held that a defendant may not be held liable for fraudulently obtaining assets under the custody of a bank unless he has the specific intent to defraud the bank. *Id.* at 199. "We hold, therefore, that conduct, reprehensible as it may be, does not fall within the ambit of the bank fraud statute when the intention of the wrongdoer is not to defraud or expose the bank to any loss but solely to defraud the bank's customer." *Id.*

Here, there is obviously no evidence that Santander intended to defraud itself. Under the holding in *Thomas*, a claim under Section 1344 cannot survive a motion to dismiss when a complaint is entirely devoid of allegations that the defendant attempted to impose a loss on a financial institution. Accordingly, the Court determines that the Trustee has failed to establish federal bank fraud as a predicate offense to its New Jersey RICO claim.

### d.    Omnibus Objections to Predicate Acts I through VIII: Scienter

Santander next argues that the Complaint "fails to allege the knowing intent element of the alleged predicate acts of bank fraud, sale and transportation of stolen

property, money laundering, and mail and wire fraud and the predicate acts of aiding and abetting those primary predicate acts." Def.'s Br. 30.

The Court rejects Santander's argument. As discussed *supra*, the Court finds that the Trustee has proffered sufficient circumstantial evidence to create a plausible inference that Santander and its employees knowingly intended to assist the Non-Party Conspirators with their fraudulent conduct. Hicks-Finnerty testified to this Court that she scrupulously required all signatories to present valid identification. In light of her familiarity with her job requirements, it is plausible to believe that Hicks-Finnerty and Green's actions were the result of something more than mere negligence. And given the fact that Hicks-Finnerty and Green might have been aware that the Non-Party Conspirators were engaging in fraudulent conduct, it is also plausible to infer that they knowingly failed to monitor the numerous fraudulent wire transfers, overdrafts, and other red flags. Accordingly, the Court rejects Santander's argument that the Trustee failed to allege the specific intent necessary to plead predicate the remaining predicate acts.

In the same section of its brief, Santander argues that a plaintiff in a civil RICO action may not assert a claim of aiding and abetting a statutory predicate offense. Santander also asserts that there is no private cause of action under 18 U.S.C. § 2, the federal aiding and abetting statute. Indeed this was the very holding of *Rolo v. City Investing Co. Liquidating Trust*, and the Court is bound by the Third Circuit's decision in that case. 155 F.3d 644, 657 (3d Cir. 1998). Relying on *Central Bank of Denver*, the Third Circuit concluded that "[c]ongress has not enacted a general civil aiding and abetting statute . . . [w]hen Congress enacts a statute under which a person may sue and

recover damages from a private defendant for violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id*. at 656 (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994)). The court concluded that unless the text of the predicate offense explicitly prohibits aiding and abetting, a plaintiff may not assert a claim on this ground. *Id*. at 657. Moreover, a plaintiff in a civil RICO action may not assert that a defendant aided and abetted various Title 18 violations. *Id.* As a result, the Court may not consider the Trustee's claims alleging that Santander aided and abetted Title 18 violations. In accordance with this conclusion of law, the court hereby rejects predicate offenses II, IV, VI and VIII. It is therefore unnecessary to address whether Santander's assistance was "substantial" under 18 U.S.C. § 2.

### e. Predicate Act IX: Theft by Deception

Santander further asserts that the Complaint fails to plead a claim for Theft by Deception under N.J.S.A. § 2C:20-4. The Court concurs with Santander's contention. Paragraph 215 of the Complaint comprises the Trustee's entire factual basis for the Theft by Deception claim and reads as follows:

> By purposely creating and reinforcing false impressions for the purpose of influencing consumers to purchase the Ministrelli Trust, retain MKwasnik's or KRKB's loan modification services, or invest in LSBPA's 12% Notes, and then misappropriating the sales proceeds and investment funds for personal uses and obstructing investors' inquiries into the uses of their funds, Santander violated N.J.S.A. 2C:20-4(c).

Compl. ¶ 215. The Trustee provides minimal factual basis for these assertions, and none of these allegations rise to the level of particularity necessary to survive a motion to

dismiss.  Nowhere in the Complaint does the Trustee discuss how Santander attempted to induce consumers to purchase the Ministrelli Trust, the Debtors' notes or MKwasnik's services.  Moreover, the assertion that Santander "obstructed investors' inquiries into the uses of their funds" is baseless.  Accordingly, the Court holds that the Trustee has failed to allege predicate act IX.

### f.   Predicate Act X: Falsifying or Tampering with Records

Santander also claims that the Complaint "fails to adequately plead claims against Santander for Falsifying Records (N.J.S.A. § 2C:21-4(a)) and Forgery and Fraudulent Practices (N.J.S.A. § 2C-41-1(a)(1)(o))."  Def.'s Br. 33.  In New Jersey, a person is guilty of falsifying or tampering with records if he "*falsifies*, *destroys*, removes, conceals *any writing* or record, or utters any writing or record knowing that it contains a false statement or information, *with purpose to deceive or injure* anyone *or to conceal any wrongdoing*."  N.J. Stat. Ann. § 2C:21-4(a) (emphasis added).

The Court holds that the Trustee has pled this predicate act.  The Complaint specifically states that Hicks-Finnerty and Green falsified multiple documents.  Furthermore, the circumstances surrounding the transactions create a plausible inference that Hicks-Finnerty and Green knew that these documents were not dated correctly and that the signatures on them were not authentic.  Moreover, the timing of the logbooks' disappearance and the circumstances surrounding their disappearance create a plausible inference that Santander and/or its employees intentionally destroyed the logbooks for the purpose of "concealing any wrongdoing."  Such allegations fall squarely within the

statute.  Therefore, the Court holds that the Trustee has successfully pled a falsifying or tampering with records claim.

Having addressed all of Santander's arguments in opposition to the predicate offenses, the Court will now examine the remaining predicate offenses.  To summarize the preceding section, the Court rejects the Trustee's argument with respect to predicate offenses I, II, IV, VI, VIII, and IV.  The Court accepts the Trustee's argument establishing predicate offense X (falsifying or tampering with records).  Because the Trustee must establish at least two predicate offenses in order to plead a civil RICO claim, the Court will now determine whether the Trustee has established predicate offenses III, V and/or VII.

### g.  Predicate Offense III: Transportation of Stolen Goods, Securities, Moneys

Section 2314 of Title 18 imposes liability on an individual or entity who "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."  18 U.S.C. § 2314.

The Court determines that the Trustee has pled sufficient facts to establish a predicate offense under 18 U.S.C. § 2314.  The Complaint explicitly states that the value of the Ministrelli Trust was well in excess of $5,000.  It also states that Santander authorized the transfer of the proceeds via interstate commerce.  Having already determined that the Complaint raises a plausible inference of scienter, the Court holds that the Trustee has sufficiently established predicate act III.

### h.  Predicate Offense V: Laundering of Monetary Instruments

Section 1957 of Title 18 imposes liability on any entity who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $ 10,000 and is derived from specified unlawful activity."  18 U.S.C. § 1957.  Additionally, the underlying offense must have occurred in the United States.  18 U.S.C. § 1957(d)(1).  Section 1956 creates liability for those "***knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity***, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(1) (emphasis added).

Having already established that the specific facts alleged in the Complaint combine to create a plausible inference that Santander and its employees were aware of the circumstances surrounding the Ministrelli Trust Theft, such facts fall within the definitions of money laundering set forth in these statutes.  Accordingly, the Trustee has successfully pled predicate offense V.

### i.  Predicate Act VII: Mail and Wire Fraud

Section 1341 imposes liability for whoever "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . "  18 U.S.C. § 1341.  The Court holds that this is not a predicate act for one simple reason – the Trustee has not alleged that Santander devised any of the four schemes detailed above.  In both this Complaint and the other complaints incorporated by judicial notice, the Trustee has clearly indicated that MKwasnik, the

Debtors and the other Non-Party Conspirators were the masterminds behind the four schemes. Accordingly, predicate act VII must fail.

### j. Summary of Predicate Acts and the Trustee's RICO Claim

Having determined that the Trustee has successfully pled three predicate acts, the Court concludes that the Trustee has alleged sufficient facts to create a plausible inference that Santander engaged in a pattern of racketeering activity as defined by N.J. Stat. Ann. § 2C:41-1(d).

The facts alleged in the Complaint create a plausible inference that Santander's repeated backdating of documents and falsely attesting the presence of multiple signatories combined to proximately cause the Ministrelli Trust Theft and the Lacey Property Theft. Additionally, these facts create a plausible inference that (1) the Non-Party Conspirators organization constituted an "enterprise" as defined by the relevant caselaw; (2) Santander assisted the enterprise in activities that affected trade or commerce; (3) Santander associated with the enterprise; (4) Santander willfully and knowingly participated in the conduct of the affairs of the enterprise; (5) Santander participated through a pattern of racketeering activity; and (6) that the Plaintiff was injured by reason of the Defendant's action. As a result, the Court denies Santander's motion to dismiss the New Jersey RICO claim with respect to the Ministrelli Trust Theft and the Lacey Property Theft.

### D.  Count Two: Conspiracy to Violate RICO,
### 18 U.S.C. § 1961, et. seq.

The Federal RICO statute creates an additional cause of action against individuals and entities who "conspire to violate any of the provisions of subsection[s] (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Section (c) of the federal statute mirrors Section (c) of the New Jersey statute; however, the federal statute contains an interstate commerce based jurisdictional hook.  Because Santander fails to object on this ground, and the Court has already concluded that there was an underlying RICO violation, the only issue that remains is the conspiracy itself.[12]

In its brief, Santander argues that the 1962(d) claim must be dismissed because the Trustee has failed to plead the substantive elements of a conspiracy.  The essence of a conspiracy is the existence of an agreement.  *See Salinas v. United* States, 522 U.S. 52, 64 (1997).  "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other.  *Id.* (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946)).  In order to survive a motion to dismiss, "a plaintiff must set forth allegations that address ***the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose***."  *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989) (citing *Kalmanovitz v. G. Heileman Brewing Co.*, 595 F. Supp. 1385, 1400-01 (D. Del. 1984), aff'd, 769 F.2d 152 (3d Cir. 1985)) (emphasis added).  Additionally, a plaintiff must allege specific facts which support an inference

---

[12] The Trustee alleges that the sale proceeds were transferred in and out of New Jersey.  *See* Compl. ¶ 193-195.

that the defendant knowingly agreed to participate in the affairs of the conspiracy.  *Id*. at 1167.  In order to establish these elements, a court may consider "any 'factual allegations of particular acts' within the complaint as a whole incorporated by the conspiracy claim to provide this basis."  *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (quoting *Odesser v. Continental Bank*, 676 F. Supp. 1305, 1313 (E.D. Pa. 1987)).

The Complaint sufficiently alleges the period of the conspiracy.  The Trustee describes the specific events that led to the theft of the Ministrelli Trust and the Lacey Property Theft, detailing both when they occurred and where they occurred.  He notes the specific dates that Santander aided the Non-Party Conspirators in fraudulently appointing Chalmers as successor trustee, fraudulently permitting the sale of the trust, and fraudulently assigning the sale proceeds to the Non-Party Conspirators.  He further notes that Santander employees were told to be on the lookout for various wire transfers on specified dates.  These acts also satisfy the "in furtherance of" element as they clearly occurred in order to facilitate the theft of the Ministrelli Trust – the sole object of the conspiracy.

With respect to the knowing participation element, Santander argues that the Complaint "relies on conclusory allegations to satisfy the knowledge element."  Def.'s Br. 34.  However, the Court believes that this assertion overlooks the numerous facts in the Complaint which create an inference of knowledge.  In *Shearin*, the Third Circuit held that the defendants' association with one another "gave rise to a necessary inference that [the parties] not only agreed to the ongoing securities fraud scheme, but that all three were aware that the ongoing acts, such as the unlawful collection of fiduciary fees, were

part of an overall pattern of racketeering activity." *Shearin*, 885 F.2d at 116.  The holding in *Shearin* is equally applicable here.  Incorporating by reference the section on scienter *supra*, the Court holds that the Trustee has sufficiently pled enough facts to create inference of knowledge.  The notion that Santander merely provided ordinary banking services without any knowledge of the conspiracy's underlying goals is certainly an alternative explanation.  But it is not, as Santander alleges, the "obvious alternative explanation."  At this stage of the litigation, it is simply too early to conclude that Santander had no knowledge of the conspiracy in light of the circumstances detailed in the Complaint.

## E.  Count Three: New Jersey Consumer Fraud Act

In order to state a claim under New Jersey's Consumer Fraud Act (the "CFA" or the "Act"), a plaintiff must plead the following three elements: "(1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements – defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Parker v. Howmedica Osteonics Corp.*, 2008 U.S. Dist. LEXIS 2570, at *6 (D.N.J. Jan. 14, 2008) (citing *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13 (N.J. Super. Ct. App. Div. 2003)).  The term "unlawful practice" is defined in the Act as follows:

> The act, use or employment **by any person** of **any unconscionable commercial practice**, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, **in connection with the sale or advertisement of any merchandise** or real estate, **or with the subsequent performance** of

such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, ***is declared to be an unlawful practice*** . . . .

N.J. Stat. Ann. § 56:8-2 (emphasis added).  The CFA defines the term "person" to mean "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof."  N.J. Stat. Ann. § 56:8-1(d).  Merchandise is also defined broadly and includes any service offered to the public for sale.  N.J. Stat. Ann. § 56:8-1(c).  Additionally, any person "who suffers any ascertainable loss of moneys or property, real or personal" as a result of another's use of an unlawful practice has standing to assert a claim under the CFA.  N.J. Stat. Ann. § 56:8-19.  New Jersey courts interpret the provisions of the CFA liberally and have noted that the Act is "one of the strongest consumer protection laws in the nation[.]" *Weinberg v. Sprint Corp.*, 173 N.J. 233, 257 (2002) (quoting *Governor's Press Release for Assembly Bill No. 2402*, at 1 (June 29, 1971)).

The Trustee alleges that Santander's conduct amounted to an "unlawful practice" under the CFA as it engaged in "***unconscionable commercial practices***, deceptions, frauds, false pretense, false representations, misrepresentation, or knowing concealment causing an ascertainable loss by the debtors."  Compl. ¶ 225 (emphasis added).  Courts have noted that unconscionability is "an amorphous concept obviously designed to establish a broad business ethic."  *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640 (1971)).  This standard implies a lack of "good faith, honesty in fact and observance of fair dealing."  *Id.*

The Court agrees that Santander's conduct, as alleged in the Complaint, fits within this definition. Santander's backdating of the Successor Trustee Agreement, backdating of the Assignment Agreement, fraudulent notarization of multiple other documents and false attestation of the signature of the Debtors' CEO collectively rise to the level of an "unconscionable commercial practice" as defined by the court in *Cox* and *Kugler*. Santander's active participation in laundering the Debtors' funds constitutes a lack of "good faith, honesty in fact and observance of fair dealing." Accordingly, the Court finds that the Trustee has adequately alleged that Santander engaged in an "unconscionable commercial practice" with respect to the Ministrelli Theft and the Lacey Theft.

Notwithstanding the above, Santander argues that because the Complaint "has failed to allege that the Debtors purchased or were provided any service by Santander," the Trustee does not have standing to pursue a CFA claim. It correctly notes that the statute mandates that an "unconscionable commercial practice" must occur in connection with "the sale or advertisement of any merchandise . . . or with the subsequent performance" in order to be deemed unlawful. Def.'s Br. 36; N.J. Stat. Ann. § 56:8-2. Santander argues that because the handling of the Ministrelli Account and the false notarizations were services requested by the Non-Party Conspirators and not by the Debtors, Santander's conduct was not made "in connection with the subsequent performance of such person."

The Court finds Santander's narrow interpretation of the CFA and its elevation of form over substance to be inconsistent with the policies underlying the Act. Furthermore, New Jersey courts have held that the CFA imposes no direct privity requirement on

49

potential plaintiffs and that certain indirect relationships between a buyer and a seller may give rise to a CFA claim. *See Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 579 (2011) (holding that contractual privity between the buyer and seller was not necessary for a CFA claim). With regard to Santander's relationship with the Debtors, a strong indirect relationship is present. First, it was the Debtors who first appointed MKwasnik as trustee. MKwasnik and the Non-Party Conspirators fraudulently appointed Chalmers as successor trustee of the Ministrelli Trust and contracted with Santander to perform services on the Debtors' behalf. Santander then fraudulently notarized an agreement authorizing the sale of the Debtors' largest asset and actively enabled the Non-Party Conspirators to launder the proceeds. Accordingly, the court finds that the Trustee's Complaint adequately pleads that Santander's unconscionable commercial practices occurred "in connection with" the performance of a service to the Debtors and therefore constitutes an unlawful practice for purposes of the CFA.

Making one final argument, Santander alleges that its conduct cannot be deemed "unlawful" under the CFA because it never induced the Debtors to purchase a good or service. However, courts in New Jersey have repeatedly rejected this argument. *See Cox*, 138 N.J. at 17 ("[a] practice can be unlawful even if no person was in fact misled or deceived thereby"); *O'Brien v. Cleveland (In re O'Brien)*, 423 B.R. 477, 488 (Bankr. D.N.J. 2010) ("the terms - unconscionable commercial practice, deception, fraud and false promise - are used disjunctively so it is conceivable that a commercial practice might not be fraudulent or deceptive but would, nevertheless, be unconscionable"). Fraudulent behavior that induces a plaintiff to purchase a good or service is merely one of

the many practices deemed "unlawful" under the CFA.  Proof that a defendant engaged in an unconscionable commercial practice in connection with the subsequent performance of a service alone is "sufficient to establish unlawful conduct under the Act." *Cox*, 138 N.J. at 19.

In sum, the Court concludes that the Complaint pleads that Santander's actions with respect to the Ministrelli Trust Theft and the Lacey Property Theft were unlawful under the CFA as they constituted an unconscionable commercial practice in connection with services rendered to the Debtors.  Moreover, the Complaint sufficiently alleges that Santander's actions were a substantial and proximate cause of the Ministrelli Trust Theft, the Lacey Theft and the Debtors' injuries.  Accordingly, the Trustee has stated a valid claim under the New Jersey CFA with respect to these two transactions.  However, because Santander's actions were not a direct and proximate cause of Santander's loss from the Hope Now Scheme, the CFA claim with respect to this transaction is hereby dismissed.

### F.  Count Four: Negligence

Under New Jersey common law, a plaintiff in a negligence action must show (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages.  *Polzo v. County of Essex*, 196 N.J. 569, 584 (2008) (quoting *Weinberg v. Dinger*, 106 N.J. 469, 484 (1987)).  In its brief, Santander argues that banks generally do not owe a duty to non-customers that are injured as a result of their negligence.  Def.'s Br. 37.  Alleging that the Debtors were not its customer,

Santander claims that the negligence claim should be dismissed because it owed them no duty.

New Jersey courts have concluded that "[w]hether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Weinberg*, 106 N.J. at 484 (quoting *Kelly v. Gwinnell*, 96 N.J. 538, 544 (1984)).  In the context of a financial institution, "courts will typically bar claims of non-customers against banks" in the absence of an agreement between the bank and the non-customer.  *City Check Cashing v. Mfrs. Hanover Trust Co.*, 166 N.J. 49, 60 (2001).  However, even in the absence of a formal agreement, banks may owe a duty to non-customers on the basis of a "contact."  *Id*. at 60.  A contact is determined by analyzing the surrounding circumstances and by examining whether the bank was on notice of the non-customer's special needs. *Id*. at 62.  In one case the Trustee cites to, the appellate court noted that the "resolution of this issue turns on the evidence of what [the bank representative was told] when the account was opened and what, if it can be determined, the representative knew or should have known."  *ADS Assocs. Group v. Oritani Sav. Bank*, 2011 N.J. Super. Unpub. LEXIS 3123, at *26-27 (N.J. Super. Ct. App. Div. Dec. 29, 2011).  In *Oritani*, the court determined that the bank representative's awareness of the non-customer plaintiff's concerns created a duty.  *Id*. at 30.  "Based on Allen's concerns when Account 3604 was opened, the Bank's knowledge of the other two ADS accounts, the  testimony of Pinto and Pierson, and the jury's determination that the internet transfers were not authorized, we conclude that Allen's 'contact' with the Bank created a special relationship."  *Id*.

Applying this standard, the Court finds that the Complaint sufficiently alleges that the Debtors had a contact with Santander.    The Complaint specifically alleges that "Chalmers . . . asked Green to open up an account in the name of LSBPA's Ministrelli Trust, purportedly for the benefit of LSBPA."    Compl. ¶ 72.    Additionally, the Trustee alleges that "Santander's documents indicate that the Trust Agreement was personally reviewed by the manager of the Westmont Branch, Nancy Cavaluchy."    *Id*.    Moreover, the Complaint states that Hicks-Finnerty and Green were notified the moment the $300,000 installment payment was wired to the Ministrelli Account.    *Id*. at ¶ 88. Chalmers immediately proceeded to launder $290,000 from the Ministrelli Account to MFaiola, yet Santander failed to investigate this payment despite knowing that the Ministrelli Account was a trust account.    While Santander suggests that its employees were unaware that LSBPA was the beneficial owner of the Ministrelli Account, the Trustee has alleged enough facts to create a plausible inference that the opposite is true. Although the Debtors' name is not provided on the account card attached by Santander, there is enough information to put Santander on notice that another entity besides Chalmers held an interest in the Ministrelli Account.    As a result, the Court holds that the Trustee has sufficiently pled the elements of duty and breach.    Moreover, because the Court has already sustained allegations that Santander's actions were both an actual and proximate cause of the Debtors' loss, the Court must deny Santander's motion to dismiss the negligence claim.    For the reasons articulated *supra*, the Court denies the Motion as it relates to the Ministrelli Trust Theft and the Lacey Theft and grants the Motion as it relates to the Hope Now Scheme.

### G.  Counts Five, Six, Seven and Eight:  Aiding and Abetting

The Trustee's next four counts allege that Santander was an accomplice to various non-statutory common law offenses.  These claims include conversion, fraud, and breach of fiduciary duties.  Santander does not contest that the underlying offenses were committed by the Non-Party Conspirators.  Rather, it argues that the Trustee has failed to plead that Santander aided and abetted these offenses.

In order to be found liable as an aider and abettor in New Jersey, the plaintiff must demonstrate "(1) that there has been a commission of a wrongful act . . . ; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing."  *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978).  Santander argues that the second and third prongs of this test are not met.  However, having made a determination of elements two and three *supra*, the Court rejects Santander's claim.  Accordingly, the Court denies the Motion to dismiss counts five through eight with respect to the Ministrelli Theft and the Lacey Theft.

With respect to the Hope Now Scheme, the Court has already made a determination that Santander's actions were not a legal cause of the Debtors' injuries.  However, because the aiding and abetting claims seek to hold Santander vicariously liable for the offenses of the Non-Party Conspirators, the Court may not dismiss the aiding and abetting claims arising from the Hope Now Scheme.  The Complaint alleges that MKwasnik and the Non-Party Conspirators proximately caused the loss of the Debtors' client trust account and that Santander may have had knowledge of the

54

underlying fraudulent activity.  Accordingly, the Court denies the Motion to dismiss the aiding and abetting with respect to the Ministrelli Theft, the Lacey Theft, and the Hope Now Scheme.

### H.  Count Nine: Unjust Enrichment

Unjust enrichment is an appropriate remedy when "one party has been unjustly enriched at the expense of another."  *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 575 (1996).   Santander argues that because it received no benefit directly from the Debtors, the claim for unjust enrichment should be dismissed.  The Trustee, on the other hand, alleges that Santander received exceptionally large banking fees as a result of its misconduct.  The Court believes that it is too early in the litigation to resolve this issue.  Whether or not Santander was unjustly enriched at the expense of the Debtors is an issue of fact for the Court to determine.  Accordingly, the Motion to dismiss count nine is denied.

### I.  Count Ten:  Failure to Supervise

The central issue with respect to the Trustee's failure to supervise claim is whether or not Santander owed a duty to the Debtors.  Because this issue was resolved in the negligence claim, the Motion to dismiss count ten is denied.

### J.  Count Eleven:  Attorney's Fees

Whether or not a party is entitled to attorney's fees is an issue of fact to be decided at a later time.  Accordingly, the Court denies Santander's Motion to dismiss this count.

### III. <u>CONCLUSION</u>

For the aforementioned reasons, Santander's Motion is GRANTED with respect to all claims arising out of the Debtors' notes offering. Furthermore, the Motion is GRANTED with respect all direct liability claims arising out of the Hope Now Scheme and DENIED with respect to all vicarious liability claims arising out of the Hope Now Scheme. Finally, the Motion is DENIED with respect to all claims arising out of the Ministrelli Trust Theft and the Lacey Property Theft.

Dated: October 26, 2015

_____
KEVIN GROSS, U.S.B.J.